**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

| | |
|---|---|
| **SALLIE MAE BANK,**<br><br>                              Plaintiffs,<br><br>      v.<br><br>**WILLIAM ANTHONY GOODWIN,**<br><br>                              Defendant. | Case No. _____ |

## COMPLAINT

1.      Plaintiff Sallie Mae Bank ("SMB"), by and through its undersigned counsel, for its

Complaint against William Anthony Goodwin ("Goodwin"), states as follows:

## NATURE OF THE ACTION

2.      This action is brought by SMB to prevent its former employee, Goodwin, from

further misappropriating its trade secrets and other confidential and proprietary information in

violation of: (a) the federal Defend Trade Secrets Act; (b) the Virginia Uniform Trade Secrets Act;

(c) his Confidentiality Agreement with SMB; and (d) the fiduciary duties that Goodwin owed to

SMB both during and following the termination of his employment.  Leading up to his termination

on November 8, 2021, Goodwin surreptitiously transmitted eleven (11) e-mails attaching 13 SMB

documents to two of his personal e-mail accounts.  The documents contain competitive and trade

secret information created and owned by SMB, including data relating to SMB's loan performance,

balance assumptions, loss rates, return on equity calculations, cost to acquire calculations, and net

present value valuations.  The documents also identify current SMB clients and prospective clients

by name, client contact, job title, address, telephone number, and e-mail address, as well as details

about confidential client agreements.  In sum, those documents contain highly sensitive, proprietary data that SMB developed over several years and at great expense, which a competitor can use to gain an unfair and unlawful competitive advantage over SMB.

3.    Through this action, in addition to other relief, SMB seeks emergency injunctive relief directing Goodwin to return SMB's trade secret and other confidential and/or proprietary information, as well as preliminary and permanent injunctive relief preventing Goodwin from engaging in further acts of misappropriation and ongoing breaches of confidentiality.

## PARTIES

4.    SMB is a Utah industrial bank organized under the laws of the State of Utah, with its principal place of business located at 175 South West Temple, 6th Floor, Salt Lake City, Utah, 84101.  SMB is engaged in the business of consumer lending and offers various credit products, including but not limited to private student loans.  SMB maintains employees nationwide and offices in five states, including but not limited to the Commonwealth of Virginia.

5.    Goodwin is a natural person who, upon information and belief, resides and may be served with process at his home in Williamsburg, Virginia.

6.    Goodwin most recently worked directly for SMB Business Development, Inc.[1] as a National Accounts Manager, from his remote home office in Virginia, until his termination on November 8, 2021.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because SMB asserts claims for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C.

---

[1] SMB Business Development, Inc. is a corporation organized under the laws of the State of Delaware and is a wholly owned subsidiary of Sallie Mae Bank.  SMB Business Development, Inc. employs numerous sales representatives and relationship managers, and provides shared marketing and business development services to Sallie Mae Bank.

§ 1836, *et seq.* against Goodwin.  This Court has supplemental or pendant jurisdiction over SMB's remaining claims, under 28 U.S.C. § 1367, because those claims are related to SMB's federal claims and form part of the same case or controversy under Article III of the United States Constitution.

8.      Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(1) because Goodwin is a resident of the Commonwealth of Virginia and resides in this district.  Venue also is appropriate in this judicial district under 28 U.S.C. § 1391(b)(2) because the events that gave rise to this Complaint occurred in this district.

9.      For those reasons, this case is appropriately filed in the Newport News Division of this Court.

## FACTS RELEVANT TO ALL CLAIMS

### SMB's Business and Confidential, Proprietary and Trade Secret Information

10.     SMB, commonly known as "Sallie Mae," is a diversified financial services company and consumer bank that focuses on providing education, planning, and financial solutions to its customers.

11.     One of SMB's primary business lines is the origination and servicing of private education loans for students and/or their families.  This includes undergraduate student loans, graduate student loans, parent loans, and career training student loans.

12.     SMB offers or has offered other solutions and credit products as well, including personal loans, credit cards, and retail deposit accounts.

13.     SMB operates in a highly competitive, interstate market.  SMB's success in the industry depends on its ability to maintain the secrecy of its loan performance history and its data models, both of which are used to inform its competitive pricing and marketing strategy.

4501700v.1

14.     In order to drive revenue and improve SMB's brand and product positioning, SMB's marketing and sales efforts are strategically organized through various "channels."

15.     SMB's Partner Channel ("Partner Channel") is tasked with establishing business relationships with various financial institutions, including banks and credit unions and marketplace lenders.  Through agreements negotiated by Partner Channel, these relationships are aimed at extending SMB's brand and offering various student loan products to a broader market.

16.     SMB's competitors and potential competitors in the Partner Channel business include Discover Financial Services, Navient, College Ave Student Loans, and Credit Union Student Choice, among others.  Those and other competitors market their own private education loan offerings and compete or could compete with SMB for a share of the same market and the same customers, including the partner institutions targeted by Partner Channel.

17.     The value of SMB's confidential, proprietary and trade secret information is in its exclusive use by SMB and its employees.  That information is one of SMB's most valuable assets.

18.     SMB would lose its competitive advantage if one of its competitors obtained its confidential, proprietary, and trade secret information.

19.     The documents and information misappropriated by Goodwin are not available to the public, and are not generally known in the private education loan industry or the financial services industry at large.  SMB expended significant effort and expense to develop and compile that data and to maintain its confidentiality and secrecy.  SMB did so to enable it to develop competitive pricing to new and existing customers.

**Goodwin's Employment with SMB**

20.     Goodwin worked for SMB from July 14, 2014, until his termination on November 8, 2021.  SMB hired Goodwin for the position of National Accounts Manager, reporting to Kurt

Hansen, Senior Director, Partner Channel.  As a member of the Partner Channel sales team, Goodwin worked remotely from a home office located in Williamsburg, Virginia.

21.    During his employment at SMB, Goodwin's primary duty was to identify and cultivate relationships with prospective clients, such as banks, credit unions, financial planning firms, marketing partners, and other financial institutions.  These relationships are developed with the intent to negotiate contracts to refer SMB education loan products to the prospective partner's customers.  To that end, as National Accounts Manager, Goodwin was responsible for revenue generation and securing contractual relationships with financial institutions to promote Sallie Mae's private education loans nationwide.  Specifically, Goodwin's job duties included driving revenue by executing contracts with new financial institutions, developing sales plans, strategies and campaigns to secure business relationships with new lender partners and negotiating contractual terms with these prospects, upgrading existing partners to higher level products, and renewing contracts with performing partners contracts.

22.    As part of his job duties, Goodwin was deeply involved in cultivating and maintaining business relationships with client lenders.  Over the last several years, he and other Partner Channel employees in similar roles worked to develop comprehensive prospective client lists to be used by SMB in marketing campaigns (hereinafter, "Prospect Lists").  These Prospect Lists were painstakingly compiled to identify target financial institutions, and more importantly, the contact information for relevant key decision makers within them, including their mailing address, direct telephone number, and/or e-mail address.

23.    The level of detail contained in the Prospect Lists is not publicly available, and was obtained over the course of years of the Partner Channel sales team prospecting potential clients through attending conferences, mailing campaigns, and conducting sales calls and meetings.

24.     A competitor or prospective competitor could use the Prospect Lists to obtain an unfair competitive advantage in targeting the same prospective clients identified by SMB, without having to expend the time and resources required to generate such information.

25.     In order to perform his job duties, SMB gave Goodwin access to SMB's confidential, proprietary, and trade secret information, such as SMB's data and models relating to the performance of the Partner Channel (hereinafter, "Performance Data.")  As part of his job duties, Goodwin would reference the Performance Data, including a Semi-Annual Pricing Request Report, to negotiate pricing terms and contract details with prospective clients.  The Semi-Annual Pricing Request Report contains proprietary information, including but not limited to SMB's calculations on return on equity, cost to acquire, historical loan performance, and other assumptions and information used to demonstrate the price and profitability of the Partner Channel.  SMB painstakingly develops those projections and assumptions based on its decades of data regarding historical student loan performance.

26.     The information contained in the Performance Data is not generally known to others in the private education loan industry or the financial services industry at large.  Thus, it is highly valuable information that a competitor can use to gain a competitive advantage over SMB.

27.     A competitor or prospective competitor could use the Performance Data to re-create or reverse engineer SMB's profitability calculation models and unfairly derive competitive advantage, effectively availing itself of an insider's view on SMB's decades of loan performance data and other proprietary information.  Significantly, the information contained in the Performance Data could be used to undercut SMB in negotiations with SMB's customers and prospective customers.

4501700v.1

28.     Finally, to fulfill his job duties, Goodwin was also granted access to existing highly curated client lists (hereinafter, "Client Lists.")   SMB's Client Lists contain confidential performance information and marketing data, including marketing campaigns and strategies, for approximately 200 direct clients, as well as over 1,500 clients managed by third parties.  SMB's Client Lists contain details of loan volumes, approval rates, and other performance data specific to each of SMB's existing customers.   Additionally, SMB's Client Lists contain details on marketing commitments and other contract terms specific to each of SMB's existing customers.

29.     The information contained in the Client Lists is not publicly available and is not generally known to others in the private education loan industry or the financial services industry at large.  Thus, it is highly valuable information that a competitor can use to gain a competitive advantage over SMB.

30.     A competitor or prospective competitor could use the Client Lists to unfairly target SMB's existing Partner Channel client base nationwide utilizing SMB's long-term and confidential research.   The information contained in the Client Lists could also be used by a competitor or prospective competitor to determine which of SMB's existing clients should be targeted based on potential performance or level of existing commitment.

31.     Over the course of his employment with SMB, Goodwin learned of, and benefitted from, SMB's confidential, proprietary, and trade secret information.

4501700v.1

## SMB's Efforts to Protect its Business Information

32.　　SMB takes reasonable steps to protect its confidential, proprietary, and trade secret information, including requiring employees with access to that information to execute a Confidentiality Agreement.

33.　　Thus, SMB required Goodwin to execute a Confidentiality Agreement at the start of his employment.  The Confidentiality Agreement provides, in relevant part, as follows:

> I recognize that my work as an employee of the Company will bring me into close contact with confidential information of the Company not publicly known.  This may include, but is not limited to, know-how, technical data, methods, processes, formulations, [and] techniques . . . . I expressly acknowledge and agree that the Company's confidential information is proprietary and confidential and that, if any of the confidential information was imparted or became known by any persons, including me, engaging in a business in any way competitive with the Company, such disclosure would result in hardship, loss, irreparable injury and damage to the Company, the measurement of which would be difficult, if not impossible, to determine. . . . I agree to keep secret all such confidential information and trade secrets of the Company and agree not to, directly or indirectly, other than as necessary in the Company's business and in the scope of my employment, disclose or use any such confidential information at any time (during or for two years following my employment with the Company) except upon the Company's prior written consent. . . . I will use all reasonable precautions to assure that all such written and computer stored materials are properly protected and kept from unauthorized persons.

34.　　In addition, the Confidentiality Agreement states:  "I further acknowledge that the preservation and protection of the confidential information is an essential part of my duties of employment and that, as a result of my employment with the Company, I have a duty of fidelity, loyalty, and trust to the Company in handling the confidential information."

35.　　The Confidentiality Agreement also required Goodwin to return SMB information upon his departure:  "I further agree to deliver same, including all copies, promptly to the Company upon termination of my employment, or at any time it may request."  According to Sallie Mae

records, Mr. Goodwin agreed to abide by the terms of the Confidentiality Agreement on July 15, 2014.

36.     A copy of the Confidentiality Agreement, which is incorporated by reference, is attached as Exhibit A to the Declaration of Kurt Hansen ("Hansen Declaration"), which is attached to the Memorandum in Support of Sallie Mae Bank's Emergency Motion for Temporary Restraining Order, filed contemporaneously with this Complaint.

37.     In sum, Goodwin had an obligation to safeguard SMB's confidential information, keep it secret, not use it except in connection with his employment with SMB, and to return it when his employment ended.

38.     SMB takes other reasonable precautions to protect its confidential information and trade secrets from improper disclosure. For example:

A.     SMB's computer systems and internal databases are access controlled, including through password-protection and other methods of authentication;

B.     SMB routinely blocks access to externally hosted e-mail accounts, including Gmail, Yahoo Mail, etc., on SMB computer systems and networks;

C.     SMB requires that employees work on SMB-related matters exclusively on SMB-owned and -issued computers, or other devices specifically approved by SMB's Information Security department;

D.     SMB directs employees to refrain from e-mailing SMB confidential information and documentation to private, personal e-mail accounts;

E.     SMB routinely restricts employees' ability to access removable storage devices, such as USB flash drives, on SMB issued devices;

4501700v.1

F.    SMB prohibits the installation and use of unauthorized programs on SMB issued hardware, including cloud-based applications such as Box, Dropbox, and other file hosting services;

G.    SMB utilizes access controls to ensure confidential files are only accessible to those employees with a clearly defined business need;

H.    SMB provides employees with VPN capabilities to securely access SMB's network remotely, if required to perform their job duties;

I.    SMB restricts physical access to office locations to employees and individuals who have a valid security access control badge and appropriate permissions for such location;

J.    SMB instructs and trains employees about appropriate methods for proper storage and disposal of sensitive information, and makes available secure shred bins throughout its office locations;

K.    SMB instructs and trains employees about their fiduciary duties to use trade secrets, confidential, and proprietary information in authorized manners only;

L.    SMB requires employees to undergo annual training and re-certification relating to confidentiality of SMB information, including customer information and other sensitive information;

M.    SMB employs sophisticated electronic security measures to identify suspicious activity on its servers and e-mail accounts; and

N.    SMB employs data loss prevention (DLP) software tools to detect potential data breaches and data exfiltration transmissions.

4501700v.1

39.     Consistent with these precautions, SMB issued Goodwin a corporate laptop computer and cellular telephone to conduct SMB business.  SMB instructed Goodwin to use such devices to conduct SMB business.  Therefore, Goodwin had no legitimate business need to e-mail SMB proprietary information to himself on personal devices or e-mail.

40.     As a remote employee, SMB provided Goodwin with access to SMB's network to use in connection with his employment for SMB.  SMB likewise provided Goodwin with a Company e-mail address to conduct business on behalf of SMB.

41.     In furtherance of SMB's efforts to protect its business information, Goodwin was required to use a virtual private network ("VPN") in order to securely access SMB's network remotely.  With that, Goodwin had no legitimate business need to e-mail SMB proprietary information to himself on personal devices or e-mail.

42.     SMB's employees also must comply with SMB's Acceptable Use Policy, its Corporate Information Security Program, and its Code of Business Conduct.  Copies of the Acceptable Use Policy, Corporate Information Security Program, and Code of Business Conduct, which are incorporated by reference, are attached as Exhibits to the Hansen Declaration.

43.     Among other relevant provisions, the Acceptable Use Policy states:

> All Sallie Mae data elements remain the property of Sallie Mae, including following an individual's departure from the corporation.  Upon resignation or termination of employment, all technology resources, data elements and information assets, including those which were developed by the departing employee, shall be turned over to the responsible manager and shall remain the property of Sallie Mae.  This includes storage of data elements on portable devices; regardless of who owns the device.

44.     This policy is reiterated verbatim in the Corporate Information Security Program, and specifies that confidential, proprietary and/or trade secret information includes, but is not limited to:

- Data Assets, including production, development, testing, statistical, voice and image information.
- Hardware Assets, including mainframe, mid-range, mini, micro, network and communication system computer equipment and all associated peripherals.
- Software Assets, including packaged off-the-shelf, vendor-supplied and internally developed computer software, applications and utility programs.
- Published Assets, including files, manuals, policies, procedures, standards, reports, statistics, strategic/marketing reports and other documents, both in paper and electronic format.
- Operational Assets, including facsimiles, electronic mail, customer and client information.
- Intellectual Assets, including trade secrets, strategic plans, competitor intelligence, and analytical reports.

45.   Consistent with those two policies, the Code of Business Conduct further states:

> **Confidential Information**.  We expect our employees to safeguard confidential information about Sallie Mae and about the companies and clients with which we do business.… We are particularly concerned about protecting the systems and product designs, procedures, source code, specifications, pricing guides, documents, software and other work product that our employees produce during the course of their employment.  Such work product is the property of Sallie Mae, and as such, Sallie Mae is entitled to ownership of the copyright, patent, trade secret, and any other proprietary rights to the material.  In this regard, you may not copy, remove or send outside the company on the Internet any proprietary documents or other materials except as authorized….

> ***

> **Protection of Company Assets**.  Company assets, such as information, supplies, equipment, materials, intellectual property, software, hardware and facilities, are valuable resources and are to be used for business purposes.  Safeguarding this property from loss, damage or theft is the responsibility of all employees.  No one may take Sallie Mae property or assets for personal or third-party use or gain, nor give them away, sell or trade them without proper authorization.

46.   The Code of Business Conduct also sets out Goodwin's fiduciary duty to place Company interests above his own and to avoid even the appearance of a conflict of interest.  The relevant provision states:

> An actual conflict of interest arises when your personal situation clouds your judgment and affects your ability to act in a manner consistent with Sallie Mae's protected interests.  An apparent conflict occurs when your

personal interests have the potential to interfere or could be perceived by others to interfere with your ability to exercise your judgment in the best interests of Sallie Mae. . . . As a Sallie Mae employee, you must avoid conflicts of interest.

47.     During their new-hire orientation, and annually thereafter, SMB employees must read the Code of Business Conduct and certify that they have read and understand those requirements.  SMB's business records reflect Goodwin did so on March 27, 2015, September 13, 2016, March 21, 2017, September 19, 2018, April 3, 2019, April 9, 2020, and April 28, 2021.

### Goodwin Misappropriates SMB's Confidential Information

48.     On October 28, 2021, SMB's security systems identified suspicious e-mail activity from Goodwin's work e-mail account, suggesting Goodwin attempted to send company data to his personal e-mail account.

49.     On October 28, 2021, Kurt Hansen received an unscheduled telephone call from Goodwin, who stated that his access to SMB's system was suspended after he "accidentally" included a confidential file in an e-mail to his personal e-mail account while otherwise sending personal files.

50.     During that same conversation Goodwin also revealed that he had accepted an offer of employment with a direct competitor of SMB, Navient.

51.     At about the same time, Hansen received an e-mail from SMB's Corporate Security department reporting that Goodwin attempted to e-mail confidential SMB information to his personal e-mail address, and that Goodwin's system access had been suspended pending the completion of an investigation.

52.     On October 29, 2021, SMB placed Goodwin on administrative leave pending further investigation into his conduct, including a review of e-mails sent by Goodwin from his SMB e-mail account.

13

53.     Upon further investigation, SMB discovered that between September 26, 2021 and October 28, 2021, Goodwin sent 17 e-mails from his SMB e-mail account to his personal MobileMe and Outlook e-mail accounts.  Attached to those e-mails were 13 SMB files, including multiple Excel spreadsheets containing confidential SMB information.  On September 26, 2021, Goodwin sent an email to his personal MobileMe account containing a file that appears to be a Google document.  However, SMB is unable to access the document and assess whether it contains SMB property that is confidential, proprietary, and/or trade secrets information.

54.     On November 8, 2021, SMB terminated Goodwin's employment for gross misconduct.

55.     Upon information and belief, Goodwin is now employed by Navient, and currently holds the title of Director, Sales and Partnership.

56.     Of the 13 files that Goodwin transferred to his personal accounts, 12 contain confidential, proprietary, and trade secrets information.

57.     The documents and information transmitted by Goodwin to his personal accounts include Prospect Lists, Performance Data, and Client Lists.

58.     Specifically, the documents that Goodwin misappropriated before leaving SMB to work for a direct competitor, Navient, include, but is not limited to:

A.      An Excel spreadsheet, attached to an e-mail that Goodwin sent to himself on September 27, 2021 at 10:34 am, containing proprietary SMB loan performance, balance assumptions, loss rates, return on equity calculations, cost to acquire calculations, and net present value calculations.  In sum, this document provides insight on SMB's profitability calculations.

B.      An Excel spreadsheet, attached to an e-mail that Goodwin sent to himself on October 5, 2021 at 12:08 pm, containing a list of 760 credit union prospects, including the contact name, job title, mailing address, and e-mail address for each Prospective Client.

C.      An Excel spreadsheet, attached to an e-mail that Goodwin sent to himself on October 5, 2021 at 12:09 pm, including customized lender demographic data (name, address, contact number) for all client and non-client lenders in one of SMB's markets.

14

D.     An Excel spreadsheet, attached to an e-mail that Goodwin sent to himself on October 7, 2021 at 10:34 a.m., including information concerning the level of marketing engagement with current Partner Channel clients.

E.     An Excel spreadsheet, attached to an e-mail that Goodwin sent to himself on October 7, 2021 at 12:39 pm, containing a list of over 440 prospect banks with contact officials identified by name, job title, physical address, and e-mail address.

F.     And, an Excel spreadsheet, attached to an e-mail that Goodwin sent to himself on October 28, 2021 at 10:22 am, containing application and volume reports for all Partner Channel clients spanning several years.

59.     This trade secret information, which SMB developed over many years and at considerable time and expense, relates primarily to SMB's Partner Channel business.

60.     The documentation that Goodwin took also reveals inside loan performance and information profitability data.  As described above, the information is highly sensitive, proprietary data that SMB uses to offer the most competitive loan pricing to current and prospective customers.

61.     If this trade secret, confidential, or commercially sensitive information falls into a competitor's hands, a competitor can use it to compete unfairly against SMB.  This information would allow a competitor to compare their own performance models and projections to SMB's own, which is based on years of data, in order to unfairly undercut SMB's business.

62.     There is no legitimate business reason for Goodwin to have transmitted this information to his personal e-mail accounts, especially on the eve of his departure from SMB to work for a direct competitor.  Goodwin attempted to characterize what he did as inadvertent. However, his repeated conduct of exfiltrating SMB data over the course of approximately four weeks contradicts this assertion.

63.     Further, one of the misappropriated documents appears to be a custom Excel spreadsheet made by Goodwin compiling SMB client data in a form not routinely used by SMB. On information and belief, Goodwin generated this spreadsheet by creating a custom report from

15

Case 4:21-cv-00146-RBS-DEM   Document 1   Filed 11/24/21   Page 16 of 26 PageID# 16

one of SMB's sales tools for the primary purpose of targeting SMB's current clients and competing with SMB.

64.     Moreover, the data and information that Goodwin acquired has only one use — to target SMB's current clients and prospective clients to SMB's disadvantage.  The information is useless to Goodwin or any third party except to use in direct competition with SMB.

65.     The information would allow a competitor to offer more competitive loan pricing, and otherwise leverage SMB's well-developed historical data and proprietary approach against SMB.

66.     Under these circumstances, the only reasonable conclusion is that Goodwin intentionally misappropriated SMB's confidential, proprietary, and trade secret information to wrongfully use for his own benefit and/or disseminate it to SMB competitors.

67.     As of the date of this filing, in his capacity as Director, Sales and Partnership at Navient, Goodwin has contacted one or more existing SMB Partner Channel clients, purportedly to discuss potential partnerships.

68.     As a result of Goodwin's misappropriation of SMB's confidential, proprietary, and trade secret information, SMB has suffered and will continue to suffer irreparable harm.

69.     As a result of Goodwin's misappropriation of SMB's confidential, proprietary, and trade secret information, SMB has suffered and will continue to suffer significant damages.

70.     SMB has no adequate remedy at law.  If the Court does not enjoin Goodwin's continued misappropriation, dissemination, and use of its confidential, proprietary, and trade secret information, SMB will lose business, goodwill, customers, and its competitive advantage in the market in which it does business.

4501700v.1

71.     Because of the critical nature of the information that Goodwin misappropriated, his actions could damage SMB's overall business operations permanently and irreparably.

72.     SMB is entitled to preliminary and permanent injunctive relief enjoining Goodwin from, among other things, continuing to use and/or disclose SMB's confidential, proprietary and trade secret information.

## COUNT I

### Misappropriation of Trade Secrets
### Under the Defend Trade Secrets Act of 2016

73.     SMB re-alleges and incorporates by reference all preceding paragraphs as if fully alleged herein.

74.     Goodwin transferred, without authorization, SMB's trade secret information, including, but not limited to the documents identified above and other documents contained on SMB's network and server(s) (the "Trade Secret Information").

75.     On information and belief, Goodwin has used and/or disclosed, continues to use and/or disclose and, unless enjoined, will continue to use and/or disclose SMB Trade Secret Information to compete with SMB.

76.     SMB compiled the Trade Secret Information over many years and at great expense.

77.     SMB kept this information confidential, and took reasonable steps to preserve its secrecy, including, but not limited to, requiring Goodwin to execute a Confidentiality Agreement and restricting access to the Trade Secret Information through a variety of electronic and other means.

78.     The Trade Secret Information is secret.  It is not generally known or available to the public or SMB's competitors, and it is not readily ascertainable by other means.  SMB goes to great expense to maintain its confidentiality.

4501700v.1

79.     The Trade Secret Information provides SMB with a competitive advantage in the private education loan and financial services marketplaces.

80.     SMB's Trade Secret Information is a "trade secret" under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.* (the "DTSA").

81.     Goodwin acquired knowledge of SMB's Trade Secret Information in his capacity as National Sales Account Manager, and thus owed and continues to owe SMB a duty to maintain the secrecy of such information.

82.     Goodwin accessed and transferred the Trade Secret Information in violation of his legal obligations to SMB.

83.     On information and belief, Goodwin continues to possess SMB's Trade Secret Information.

84.     Goodwin's actions violate the Defend Trade Secrets Act.

85.     Goodwin's actions in transferring and misappropriating SMB's Trade Secret Information for his own gain were willful, wanton, and malicious, and were taken with reckless disregard for SMB's rights.

86.     Goodwin's actions have caused and will continue to cause SMB irreparable harm if not preliminarily and permanently enjoined.

87.     SMB suffers irreparable harm from Goodwin's actions, including potential loss of business, reputation, goodwill and trade secrets, all of which cannot be compensated by money damages.

88.     SMB has no adequate remedy at law because Goodwin's actions are affecting SMB's goodwill, reputation, and ability to compete in a highly competitive marketplace.

## COUNT II

### Misappropriation of Trade Secrets
### Under the Virginia Uniform Trade Secrets Act

89.     SMB re-alleges and incorporates by reference all preceding paragraphs as if fully alleged herein.

90.     Goodwin transferred to himself SMB's Trade Secret Information.

91.     SMB's Trade Secret Information is a "trade secret" under the Virginia Uniform Trade Secrets Act, Title 59.1-336, *et seq.*, of the Virginia Code (the "Virginia Uniform Trade Secrets Act").

92.     Goodwin acquired knowledge of SMB's Trade Secret Information in his capacity as National Account Manager, and thus owed and continues to owe SMB a duty to maintain the secrecy of such information.

93.     Goodwin accessed and transferred the Trade Secret Information in violation of his legal obligations to SMB.

94.     On information and belief, Goodwin continues to possess SMB's Trade Secret Information.

95.     Goodwin's actions violate the Virginia Uniform Trade Secrets Act.

96.     Goodwin's actions in transferring and misappropriating SMB's Trade Secret Information for his own gain were willful, wanton, and malicious, and were taken with reckless disregard for SMB's rights.

97.     Goodwin's actions have caused and will continue to cause SMB irreparable harm if not preliminarily and permanently enjoined.

4501700v.1

98.     SMB suffers irreparable harm from Goodwin's action, including potential loss of business, reputation, goodwill and trade secrets, none of which can be compensated by money damages.

99.     SMB has no adequate remedy at law because Goodwin's actions are affecting SMB's goodwill, reputation, and ability to compete in a highly competitive marketplace.

**COUNT III**
**Breach of Contract**

100.    SMB re-alleges and incorporates by reference all preceding paragraphs as if fully alleged herein.

101.    The Confidentiality Agreement is a contract between SMB and Goodwin.

102.    In consideration of his employment, Goodwin agreed to be bound by the terms and conditions set forth in the Confidentiality Agreement.

103.    As a condition of his employment, among other things, Goodwin agreed that he would "keep secret all such confidential information and trade secrets of the Company" that SMB provided to him during his employment.

104.    As a condition of his employment, among other things, Goodwin agreed to return all confidential information of SMB's that he possessed at the end of his employment.

105.    The Confidentiality Agreement was supported by fair and adequate consideration and constitutes a binding and enforceable obligation.

106.    The Confidentiality Agreement is necessary to protect SMB's legitimate business interests, does not impose an undue hardship on Goodwin, and is not against the public interest.

107.    All conditions precedent necessary to permit SMB to enforce the Confidentiality Agreement have been performed or have occurred.

4501700v.1

108.    By virtue of Goodwin's conduct, including the misappropriation of confidential, proprietary, and Trade Secret Information, he has breached, and continues to breach, the Confidentiality Agreement.

109.    As a direct and proximate result of Goodwin's conduct, Goodwin has caused, and will continue to cause irreparable harm to SMB and its legitimate business interests. The harm caused by Goodwin is continuing and cannot be compensated by monetary damages alone, subjects SMB to immediate and irreparable harm, and thus, SMB is entitled to injunctive relief, including a temporary restraining order and preliminary injunction, enjoining Goodwin from misappropriating SMB's confidential, proprietary, and Trade Secret Information and requiring Goodwin to return the misappropriated materials.

## COUNT IV

### Breach of Fiduciary Duty

110.    SMB re-alleges and incorporates by reference all preceding paragraphs as if fully alleged herein.

111.    As an SMB employee, Goodwin owed SMB a duty to act in its interests and to place the interests of SMB and its shareholders above his own in cases where those interests conflict.

112.    Goodwin also had a duty to maintain the confidentiality of SMB's sensitive and trade secret information, as set forth in the Confidentiality Agreement.

113.    Goodwin's duties are also reflected in the Code of Business Conduct, which provides as follows:

> An actual conflict of interest arises when your personal situation clouds your judgment and affects your ability to act in a manner consistent with Sallie Mae's protected interests. An apparent conflict occurs when your personal interests have the potential to interfere or could be perceived by

others to interfere with your ability to exercise your judgment in the best interests of Sallie Mae. . . . As a Sallie Mae employee, you must avoid conflicts of interest.

114.    Goodwin certified his understanding of his fiduciary duties owed to SMB as set forth in the Confidentiality Agreement and the Code of Business Conduct.

115.    By virtue of Goodwin's conduct, including the misappropriation of confidential, proprietary, and Trade Secret Information, he has breached, and continues to breach, his duties to SMB.

116.    As a direct and proximate result of Goodwin's conduct, Goodwin has caused, and will continue to cause, irreparable harm to SMB and its legitimate business interests. The harm caused by Goodwin is continuing and cannot be compensated by monetary damages alone, subjects SMB to immediate and irreparable harm, and thus, SMB is entitled to injunctive relief, including a temporary restraining order and preliminary injunction, enjoining Goodwin from misappropriating SMB's confidential, proprietary, and Trade Secret Information and requiring Goodwin to return the misappropriated materials.

## REQUEST FOR INJUNCTIVE RELIEF

117.    SMB realleges and incorporates herein by reference all preceding paragraphs as if fully alleged herein.

118.    Unless Goodwin is enjoined from engaging in additional misconduct, SMB will be irreparably harmed in the marketplace by having its confidential, proprietary, and Trade Secret Information improperly, unlawfully, and competitively used against it and by loss of customer goodwill.

119.    SMB has no adequate remedy at law for Goodwin's misconduct, as money damages are not adequate to compensate for the ongoing harm caused by Goodwin's misconduct.

4501700v.1

120.    SMB has a clear legal right to the requested relief, and the balance of equities weighs heavily in SMB's favor.

121.    The public interest favors entry of an injunction to protect the legitimate business interests of parties who have substantial relationships with customers.

WHEREFORE, SMB seeks an Order from the Court:

A.      Prohibiting Goodwin from accessing, using, copying, disclosing, altering, destroying or deleting any trade secrets, proprietary and/or confidential information belonging to SMB, including any information (whether in electronic form or hard copy) taken from SMB's premises and computer systems, until further order of this Court;

B.      Requiring Goodwin, within twenty-four (24) hours of the entry of this Order, to deliver to SMB's forensic expert for forensic imaging all computers and tablets (including any laptop or desktop computers maintained at Goodwin's residence or elsewhere and over which Goodwin has custody or control), external media or storage devices (including any flash drives or external hard drives) and cell phones in his possession, custody or control;

C.      Requiring Goodwin, to the extent that he maintains any accounts with third-party e-mail providers (such as Google Gmail or Microsoft Outlook) and with third-party data storage companies (such as iCloud, Dropbox, Google Drive, or OneDrive), to provide all necessary login credentials and passwords to SMB's forensic expert, within twenty-four (24) hours of the entry of this Order;

D.      Permitting the forensic expert to maintain custody of Goodwin's computers, external media and storage devices, and cell phones until further Order of this Court;

23

E.      Enjoining Goodwin from breaching or in any way violating his Confidentiality Agreement with SMB;

F.      Requiring Goodwin, within forty-eight (48) hours of the entry of this Order, to file with this Court and serve upon SMB's counsel a sworn statement, under penalty of perjury, identifying: (a) all persons to whom Goodwin has disclosed SMB's trade secrets and other proprietary and/or confidential information; (b) all companies to which and individuals to whom Goodwin, directly or indirectly, communicated with in 2021 regarding potential employment; (c) all SMB competitors with whom Goodwin, directly or indirectly, communicated after the end of his employment with SMB; and (d) all SMB customers, vendors, and former employees with whom Goodwin, directly or indirectly, communicated after the end of his employment with SMB;

G.      Requiring Goodwin to deliver SMB's documents and other information, including all Trade Secret Information (as defined in the Complaint), in Goodwin's possession, custody, or control to the undersigned counsel within twenty-four (24) hours, together with a sworn statement, under penalty of perjury, that Goodwin has returned all such documents and other information and no longer has any such documents or other information in his possession, custody, or control;

H.      Requiring Goodwin to file with this Court and serve upon SMB's counsel a sworn statement, under penalty of perjury, identifying: (a) all persons to whom Goodwin has disclosed SMB's trade secrets and other proprietary and/or confidential information; (b) all SMB competitors or individuals whom Goodwin directly or indirectly, communicated with in 2021 regarding potential employment; and (c) all SMB

24

customers/clients whom Goodwin, directly or indirectly, communicated with after the end of his employment with SMB

I.       Requiring Goodwin to pay SMB its costs, including but not limited to the cost of the forensic examination referenced in Section B. above, and attorneys' fees for bringing this lawsuit; and

4501700v.1

J.      Such other and further relief as this Court may find just and proper under

the law.

Dated: November 24, 2021                    Respectfully submitted,

                                            **Sallie Mae Bank**


                                   _____/s/_____
                                   Henry Morris, Jr.
                                   Virginia Bar # 30844
                                   Attorney for Sallie Mae Bank
                                   Arent Fox LLP
                                   1717 K Street, NW
                                   Washington DC 20006
                                   Tel: 202.857.6000
                                   Fax: 202.857.6395
                                   E-Mail: henry.morris@arentfox.com

                                   Nicholas L. Collins
                                   Motion for Pro Hac Vice Admission Forthcoming
                                   Attorney for Sallie Mae Bank
                                   Arent Fox LLP
                                   1301 Avenue of the Americas, Floor 42
                                   New York, NY 10019
                                   Tel: 202.457.5430
                                   Fax: 212.484.3990
                                   E-mail: nicholas.collins@arentfox.com

4501700v.1